# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 18-6927

MARK H. BONNER, APPELLANT,

V.

ROBERT L. WILKIE,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued October 23, 2020                                    Decided January, 13, 2021)

*Mark H. Bonner*, of Naples, Florida, for the appellant.

*Jonathan Z. Morris*, with whom *William A. Hudson, Jr.,* Principal Deputy General Counsel; *Mary Ann Flynn*, Chief Counsel; *Sarah W. Fusina*, Deputy Chief Counsel; and *Margaret E. Sorrenti*, Appellate Attorney, all of Washington, D.C., were on the brief for the appellee.

Before BARTLEY, *Chief Judge*, and GREENBERG and ALLEN, *Judges*.

ALLEN, *Judge*, filed the opinion of the Court. GREENBERG, *Judge*, filed a dissenting opinion.

ALLEN, *Judge*: Emmett Bonner had an extraordinary career in the United States Navy. After graduating from the United States Naval Academy, he served the Nation honorably in World War II and the conflicts in Korea and Vietnam. He rose to the rank of rear admiral. As we will discuss, he passed away far too young; he was only 57.

The appellant, Mark E. Bonner,[1] is Admiral Bonner's surviving son. He appeals a November 2, 2018, Board of Veterans' Appeals decision that found no clear and unmistakable error (CUE) in a February 9, 1976, VA regional office (RO) decision that denied service connection for the veteran's cause of death.[2] This appeal, which is timely and over which the Court has jurisdiction,[3] was referred to a panel of the Court, with oral argument, to address whether the Board's decision finding no CUE in the February 1976 RO decision was arbitrary, capricious, an

---

[1] Mr. Bonner was substituted as the appellant in this matter in September 2018.

[2] Record (R.) at 3-12.

[3] *See* 38 U.S.C. §§ 7252(a), 7266(a).

abuse of discretion, or otherwise not in accordance with law. For the reasons discussed below, we are left with no option other than to affirm the November 2018 Board decision.

## I. FACTS AND PROCEDURAL HISTORY

Admiral Bonner served on active duty in the U.S. Navy from June 1939 to April 1972, including, as we noted, service in World War II, Korea, and Vietnam. Sadly, in August 1975, the veteran died. An August 1975 autopsy report listed the veteran's cause of death as Hodgkin's disease, a malignant lymphoma (a form of cancer).[4] As we will discuss below, Admiral Bonner may have actually died from non-Hodgkin's lymphoma (NHL), after a year of being diagnosed with and treated for Hodgkin's disease. In September 1975, Elizabeth H. Bonner, the veteran's surviving spouse, sought dependency and indemnity compensation (DIC) for the cause of her husband's death due to "cancer."[5]

In February 1976, the RO denied Mrs. Bonner's DIC claim, explaining that Admiral Bonner's Hodgkin's disease (cancer) was not related to service because the service treatment records were silent for that condition and he was not diagnosed with it until after he was discharged from service.[6] The following month, VA notified Mrs. Bonner that although she was not entitled to DIC for the cause of her husband's death, it would consider entitlement to non-service-connected death pension.[7] Mrs. Bonner did not appeal the February 1976 RO decision and, as we will explain, it became final.

In early 1995, Mrs. Bonner filed a claim with the Department of Justice (DOJ) under the Radiation Exposure Compensation Act[8] seeking benefits based on Admiral Bonner's participation in atomic weapons testing. In developing this claim, DOJ sought a medical opinion from the National Institutes of Health (NIH). In June 1995, NIH reviewed medical evidence related to Admiral Bonner's death, including the August 1975 autopsy report, and explained that while his cancer simulated Hodgkin's disease, it "favored" an NHL diagnosis.[9]

---

[4] R. at 157.

[5] R. at 20.

[6] R. at 1680.

[7] R. at 1644.

[8] 42 U.S.C. § 2210 note, Pub. L. No. 106-426, 104 Stat. 920 (Oct. 15, 1990). The Radiation Exposure Compensation Act, also known as RECA, provides one-time payments to certain people who participated in atomic weapons testing.

[9] R. at 155.

In October 1995, after receiving this evidence of Admiral Bonner's apparent misdiagnosis, Mrs. Bonner filed another DIC claim and applied for retroactive VA benefits. By that time, VA had issued a regulation, 38 C.F.R. § 3.313, that authorized presumptive service connection for NHL. VA made that regulation retroactively effective to August 5, 1964,[10] and the VA Office of General Counsel explained that benefits could be awarded under that regulation even if a claim had previously been denied.[11]

In November 1995, the RO reopened Mrs. Bonner's DIC claim based on the submission of the June 1995 NIH report as new evidence. The RO acknowledged that the August 1975 autopsy report reflected that Admiral Bonner died from Hodgkin's disease and the June 1995 NIH report reflected that his death was caused by NHL. The RO then granted Mrs. Bonner's claim, explaining that "[b]oth Ho[d]gkin's disease and [NHL] may be caused by exposure to an herbicide containing dioxin. Therefore, service connection for cause of death is established."[12] The RO further explained that VA considers the cause of death of a veteran to be service connected when one or more service-connected disabilities was either the primary cause of death or a contributory cause of death. The RO concluded that "[s]ervice connection for the cause of the veteran's death is granted as the evidence shows Hodgkin's disease as a contributory cause of death."[13] The RO also assigned an effective date of December 1, 1995, 1 month after VA received Mrs. Bonner's claim to reopen. Mrs. Bonner timely disagreed with that decision, specifically contesting the assigned effective date and asserting that the effective date should go back to August 1975, "the first day of the month in which [the veteran] died."[14]

In July 1996, the RO issued a Statement of the Case granting Mrs. Bonner an effective date of November 1, 1994, for DIC benefits, 1 year before the date VA received her claim to reopen. Mrs. Bonner continued to contest the assigned effective date and ultimately appealed her decision not only to the Board, but also to this Court and then the U.S. Court of Appeals for the Federal Circuit.[15] All affirmed the November 1, 1994, effective date. We will return to the judicial

---

[10] 55 Fed. Reg. 43, 123 (Oct. 20, 1990).

[11] *Id.*

[12] R. at 1524.

[13] *Id.*

[14] R. at 1507.

[15] *See Bonner v. Nicholson* (*Bonner II*), 497 F.3d 1323 (Fed. Cir. 2007); *Bonner v. Nicholson* (*Bonner I*), 19 Vet.App. 188 (1995).

decisions in a moment because, as we explain, they are critical to the resolution of the appeal before us.

In June 2008, Mrs. Bonner sought to revise the February 1976 RO decision based on CUE. She argued that § 3.313 should have retroactively applied to the February 1976 RO decision and that the evidence clearly showed that Admiral Bonner's cause of death in 1975 was misdiagnosed.[16] In July 2009, the RO found no CUE in its February 1976 decision because that decision was properly based on the evidence of record available and the laws in effect at that time. The current appellant, Mark Bonner, an attorney and the son of Admiral and Mrs. Bonner, subsequently became Mrs. Bonner's representative.[17] In October 2009, Mrs. Bonner submitted a Notice of Disagreement with the July 2009 RO decision.[18]

In September 2010, Mrs. Bonner died and the following month the appellant notified VA of her death.[19] However, and rather inexplicably, VA continued to adjudicate her appeal and in an October 2010 Statement of the Case continued to find no CUE in the February 1976 RO decision. The appellant appealed that decision to the Board.[20]

In August 2012, the Board dismissed the appeal for lack of jurisdiction, explaining that VA had not acted on a December 2010 request for substitution after Mrs. Bonner's death.[21] In September 2018, the appeal was returned to the Board after VA determined that the appellant could be recognized as a substitute for Mrs. Bonner for the purposes of reimbursement.[22] VA has never provided a satisfactory explanation for why this substitution took nearly 6 years.

In November 2018, the Board issued the decision on appeal. The Board first found that the February 1976 rating decision denying Mrs. Bonner's DIC claim had become final and that she had been properly notified of that denial. Then, the Board found, in the alternative, that even if the February 1976 RO decision had not become final, service connection for the cause of the veteran's death was granted in a November 1995 RO decision and that decision was subsumed by the Board

---

[16] R. at 189.

[17] R. at 675.

[18] R. at 671-73.

[19] R. at 657.

[20] R. at 632.

[21] R. at 542-45.

[22] R. at 29.

in its 2001 decision. Finally, the Board found no CUE in the February 1976 rating decision, rejecting the appellant's arguments for three reasons. First, the Board explained that at the time of the February 1976 rating decision, § 3.313 had not yet been promulgated and thus could not serve as a basis for finding CUE in that decision. Second, the appellant's argument that the RO misapplied § 3.313 in its November 1995 decision fails because that decision was subsumed by the Board's 2001 decision, and the RO lacked jurisdiction to consider whether CUE exists in that decision. Finally, the Board explained that none of the record evidence available at the time of the veteran's death indicated that he may have had NHL. Not until June 1995 was it discovered that the veteran almost certainly died from NHL, and that conclusion was based on evidence that did not exist in February 1976. Therefore, that evidence cannot be the basis for a finding of CUE. This appeal followed.

## II. PARTIES' ARGUMENTS

The appellant raises several arguments asserting that the Board erred in the decision on appeal. First, he argues that the Board erred when it determined that the February 1976 decision did not contain CUE because the RO impermissibly narrowed Mrs. Bonner's claim to exclude types of cancer other than Hodgkin's disease. Second, he maintains that the misdiagnosis of the cause of Admiral Bonner's death in 1975 constitutes CUE. Third, he contends that the February 1976 RO decision never became final and it is still pending under the Federal Circuit's decision in *Ruel v. Wilkie*.[23] Specifically, he asserts that Mrs. Bonner did not appeal the March 1976 RO decision because VA provided insufficient notice that it had denied her claim. In its March 1976 decision, the RO simply placed an "X" in the box labeled "disability or death not due to service" and crossed off the words "disability or." Essentially, he emphasizes that without providing any other information, the RO stated only: "death not due to service."

Finally, the appellant argues that Mrs. Bonner's claim asserting that Admiral Bonner's cause of death was "cancer" was incompletely adjudicated, because instead of addressing the claim for cancer broadly, the RO recharacterized her claim as one for only Hodgkin's disease, without explanation or notice. He explains that the evidence at the time of that decision shows that NHL

---

[23] 918 F.3d 939, 942 (Fed. Cir. 2019).

was also a potential cause of death or at least a contributing factor that the RO should have considered.

The Secretary argues that the Board's finding that there was no CUE in the February 1976 RO decision was not arbitrary or capricious. He asserts that the evidence at the time of the 1976 decision does not support the undebatable conclusion that the decision was fatally flawed. First, he argues that the evidence at the time of the February 1976 decision showed Hodgkin's disease as the cause of death, which he points out is the same cause of death that service connection was based on in 1995.

Second, he argues that the 1995 NIH report did not exist at the time of the February 1976 decision and therefore cannot be used as a basis for CUE. Even if it could be, there was no definitive diagnosis of NHL in the NIH report, a fact that was addressed and affirmed in prior Court and Federal Circuit decisions. In support of this assertion, the Secretary references the 1997 DOJ record that states that the NIH report contained evidence that favored a diagnosis of NHL but also stated that there was evidence simulating Hodgkin's disease.

Third, the Secretary asserts that any argument concerning whether the 1975 autopsy report raised the issue of NHL as the cause of the veteran's death amounts to contesting the weighing of the evidence, which cannot constitute CUE. Moreover, he asserts that this Court had already concluded at the time of the 1976 RO decision the evidence established that Mrs. Bonner's 1975 DIC claim was one for Hodgkin's disease, because the evidence did not reasonably raise any other causes of the veteran's death, including by other types of cancer.

Regarding finality, the Secretary asserts that the February 1976 rating decision became final and Mrs. Bonner received adequate notice of that decision. He explains that VA provided Mrs. Bonner with notice that went beyond a mere sentence. In fact, she was informed of the type of claim at issue, why the claim was denied, and how to appeal through the provision of a notice of her appellate rights.

### III. ANALYSIS

#### A. Prior Judicial Decisions

As we mentioned above, this is not the first time the Bonner family has been before the Court. Mrs. Bonner directly appealed a September 2001 Board decision that denied an effective date before November 1994 for her award of DIC. We issued a precedential decision in that appeal

6

affirming the Board.[24] And then the Federal Circuit affirmed our decision, also in a precedential decision.[25] We recognize that our jurisdiction in this matter is limited to a review of the November 2018 Board decision on appeal.[26] But, in Mrs. Bonner's prior appeal both this Court *and* the Federal Circuit made determinations in the precedential decisions that impact the Court's decision here today.[27]

In June 2005, the Court affirmed the Board's 2001 decision denying an effective date before November 1994 for Mrs. Bonner's DIC benefits. The Court concluded that because the final February 1976 rating decision was not reopened until November 1995, the effective-date provisions set out in § 3.114(a) only allowed for retroactive benefits to be awarded for 1 year before Mrs. Bonner filed her claim to reopen. The Court also addressed Mrs. Bonner's argument that her original 1975 claim for "cancer" encompassed a claim for all types of cancer, including NHL. However, the Court rejected that argument because it determined that the evidence of record at the time of the veteran's death did not "reasonably raise[] any claims for the cause of death by types of cancer other than Hodgkin's disease."[28] Thus, the Court's prior decision is significant for establishing at least two important points: (1) Mrs. Bonner's February 1975 claim for "cancer" did not encompass NHL; and (2) the February 1976 rating decision became final.

When Mrs. Bonner appealed the Court's June 2005 decision to the Federal Circuit, she argued that we had exceeded our jurisdiction when we determined that the cause of Admiral Bonner's death was Hodgkin's disease.[29] However, in November 2007, the Federal Circuit affirmed the Court's decision. The Federal Circuit rejected Mrs. Bonner's argument and concluded that the Court did not commit prejudicial error. The Federal Circuit explained that the Court's determination that "a claim for NHL was not supported by the evidence before the RO in 1976," was a factual inquiry it lacked jurisdiction to address.[30] As a result, our decision on that point remained. Then, with regard to Admiral Bonner's cause of death, the Federal Circuit stated that the

---

[24] *Bonner I*, 19 Vet.App. at 188.

[25] *Bonner II*, 497 F.3d at 1323.

[26] 38 U.S.C. § 7252

[27] *See Bethea v. Derwinski*, 2 Vet.App. 252, 254 (1992) (holding that the Court is bound by its own panel decisions as well as decisions of the Federal Circuit).

[28] *Bonner I*, 19 Vet.App. at 195.

[29] *Bonner II*, 497 F.3d at 1327.

[30] *Id*. at 1328.

Court did not err when it "relied on the characterization of [Mrs. Bonner's] 1975 claim, evidenced by the supporting documentation, as one for death caused by Hodgkin's disease."[31] The Federal Circuit explained that the Court "merely concluded that this information provided a plausible basis for the RO's determination that Hodgkin's disease was the cause of death."[32] The Federal Circuit essentially acknowledged that what this Court had done was to determine that based on the evidence at the time of the February 1976 rating decision the RO did not clearly err in concluding that Admiral Bonner had died of Hodgkin's disease. Judge Newman dissented because she believed that the autopsy report contained a "plainly incorrect" diagnosis and that VA had erred in not correcting the RO's erroneous denial of DIC based on that misdiagnosis.

As we discuss below, the findings in these two decisions guide us today. Quite simply, the conclusions reached in connection with Mrs. Bonner's prior appeals leave us with little room to maneuver. We will address the appellant's finality argument before addressing the remainder of his CUE arguments.

## B. Finality of the February 1976 RO Decision

Although the parties do not effectively discuss the preclusive effects of the prior decisions discussed above, it does not go unnoticed that the principles of collateral estoppel, or issue preclusion, apply here.[33] "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."[34] Essentially, the goal underlying collateral estoppel, or issue preclusion, is to prevent litigants from repeatedly litigating, and tribunals from readjudicating, finally decided issues of fact or law.[35]

---

[31] *Id.*

[32] *Id.*

[33] *See Young v. Shinseki,* 25 Vet.App. 201, 204 (en banc) (explaining that issue preclusion requires that "(1) the issue previously adjudicated is identical to the one currently before the Court; (2) the issue was 'actually litigated' in the prior proceeding; (3) the Court's resolution of that issue was necessary to the resulting judgment; and (4) the litigant was fully represented in the prior proceeding").

[34] *San Remo Hotel, L.P. v. City & County of S.F.,* 545 U.S. 323, 336 n.16 (2005).

[35] *See DiCarlo v. Nicholson*, 20 Vet.App. 52, 55-56 (2006) (holding that an issue explicitly addressed and decided in a final Board decision generally may not be readdressed in a subsequent Board decision, with certain exceptions, including where there is CUE in the earlier Board decision); *see also Hazan v. Gober,* 10 Vet.App. 511, 521 (1997) (noting that issue preclusion forbids "relitigating the same issue based upon the same evidence").

As explained above, a panel of this Court has already determined that the February 1976 rating decision became final.[36] *And* the Federal Circuit affirmed that decision.[37] Therefore, applying the principles of collateral estoppel basically ends the matter. However, even if we were at liberty to disregard these prior determinations, the evidence of record supports the Board's finding that the February 1976 rating decision became final. It is undisputed that Mrs. Bonner did not file an NOD within the 1-year period following the 1976 RO decision.[38] Instead, the appellant's argument about finality focuses on whether VA properly notified Mrs. Bonner of the 1976 denial.

In *Ruel v. Wilkie*,[39] the Federal Circuit held that "to meet the notice requirements of § 3.103(e), an explicit denial must state, or clearly identify in some way, the claim(s) being denied . . . including the reason for the decision, the date effectuated, and notice of appellate rights."[40] In applying that holding to the facts in *Ruel*, the Federal Circuit identified the one sentence purporting to notify the claimant that her DIC benefits had been denied:"The evidence does not show that the veteran's death was due to a service connected condition."[41] The Federal Circuit concluded that this sentence did not identify the claim VA had decided, noting that the sentence was sandwiched between two other sentences dealing with a claim having nothing to do with DIC benefits. The Federal Circuit concluded that such notice did not suffice to deny Mrs. Ruel's DIC claim under § 3.103(e). We can readily distinguish Mrs. Bonner's situation from that in *Ruel*.

A review of the record shows that on VA Form 21-523, dated March 9, 1976, and entitled "Disallowance," VA notified Mrs. Bonner that Admiral Bonner's death was "not due to service" and that there was "disallowance of DIC and Req. For Evidence."[42] That form also referenced the February 1976 RO decision. Reading the VA form and RO decision together reveals that VA notified Mrs. Bonner of the kind of claim the RO denied, the reason for the denial, and the date of the denial. Moreover, of record is a March 8, 1976, (FL 21-144) letter from the RO to Mrs. Bonner

---

[36] *See Bonner I*, 19 Vet.App. at 195.

[37] *See Bonner II*, 497 F.3d at 1324.

[38] 38 C.F.R. § 19.52.

[39] 918 F.3d 939.

[40] *Id.* at 942.

[41] *Id.*

[42] R. at 1677.

that includes notice of her appellate rights. Therefore, the appellant fails to demonstrate that under *Ruel* Mrs. Bonner received insufficient notice of the 1976 RO decision.

But there is more. Even if the Court assumes that Mrs. Bonner received insufficient notice, any notice error became moot after the RO reopened and granted the claim in November 1995. And after that, the Board issued a 2001 decision that affirmed the RO's 1995 grant of service connection and assigned the November 1994 effective date. And as we noted above, both this Court and the Federal Circuit affirmed the Board's 2001 decision.[43] Thus, even if there were initial notice errors regarding the 1976 denial, and to be clear, we don't think there were, they are no longer at issue.[44]

## C. CUE in the February 1976 RO Decision

The standards governing CUE are well known. CUE is established when (1) either the correct facts as they were known at the time were not before the adjudicator, the adjudicator made an erroneous factual finding, or the statutory or regulatory provisions extant at the time were incorrectly applied; (2) the alleged error is "undebatable," rather than a mere "disagreement as to how the facts were weighed or evaluated;" and (3) the error "manifestly changed the outcome" of the decision.[45] The Federal Circuit has recognized this CUE standard as controlling law.[46]

It is not easy to establish CUE in a final decision. This Court has held that an error is "undebatable" when "reasonable minds could only conclude that the original decision was fatally flawed at the time it was made."[47] In sum, "CUE is a very specific and rare kind of 'error' . . . of fact or law, that when called to the attention of later reviewers compels the conclusion, to which reasonable minds could not differ, that the results would have been manifestly different but for the error."[48]

---

[43] *Bonner II*, 497 F.3d at 1323; *Bonner I*, 19 Vet.App. at 188.

[44] 38 C.F.R. § 20.1104 (2020); *see Brown v. West*, 203 F.3d 1378, 1381 (Fed. Cir. 2000).

[45] *Russell v. Principi*, 3 Vet.App. 310, 313-14, 319 (1992); *see George v. Wilkie*, 32 Vet.App. 318, 323-24 (2020); *Simmons v. Wilkie*, 30 Vet.App. 267, 274 (2018); *King v. Shinseki*, 26 Vet.App. 433, 439 (2014); *Bouton v. Peake*, 23 Vet.App. 70, 71-72 (2008); *Damrel v. Brown*, 6 Vet.App. 242, 245 (1994); *see also Bustos v. West*, 179 F.3d 1378, 1380-81 (Fed. Cir. 1999).

[46] *See Cook v. Principi*, 318 F.3d 134, 1345 (Fed. Cir. 2002); *see also Blanton v. Wilkie*, 823 F. App'x 958 (Fed. Cir. 2020).

[47] *Andrews v. Principi*, 18 Vet.App. 177, 181 (2004), *aff'd sub nom Andrews v. Nicholson*, 421 F.3d 1278 (Fed. Cir. 2005) (quoting *Russell*, 3 Vet.App. at 313-14).

[48] *Fugo v. Brown*, 6 Vet.App. 40, 43 (1993).

The Court's review of a Board decision finding no CUE in a prior, final RO decision is limited to determining whether the Board's finding was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,"[49] and whether it was supported by an adequate statement of reasons or bases.[50] To comply with this requirement, the Board's reasons or bases must enable a claimant to understand the precise basis for the Board's decision and facilitate review in this Court.[51] The Board must also analyze the credibility and probative value of the evidence, account for the evidence that it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant.[52]

As summarized above, the Board found no CUE in the February 1976 rating decision denying DIC benefits based on service connection for the cause of Admiral Bonner's death. The appellant argues that the Board's adverse CUE determination is erroneous because the only permissible view of the evidence in 1976 reflects that Admiral Bonner died from NHL and that VA impermissibly narrowed the scope of Mrs. Bonner's 1975 claim by ignoring other forms of cancer. The appellant's arguments are unavailing.

At the time of the February 1976 RO decision, the evidence showed that Admiral Bonner had been diagnosed with only one type of cancer, Hodgkin's disease, and that Hodgkin's disease was the cause of his death.[53] Moreover, at the time of the February 1976 RO decision, § 3.313—the regulation providing presumptive service connection for NHL to which the appellant points—had not yet been adopted. Indeed, it was not yet established that NHL, or Hodgkin's disease for that matter, could develop because of herbicide exposure. It was not until 1995, when VA was presented with the 1995 NIH report (new evidence) that VA was informed that Admiral Bonner's cause of death may have been NHL and not Hodgkin's disease.[54]

Based on the evidence and the law as it existed at the time, we conclude that the Board's determination that there was no CUE in the February 1976 RO decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The appellant's

---

[49] 38 U.S.C. § 7261(a)(3)(A).

[50] 38 U.S.C. § 7104(d)(1); *see Cacciola v. Gibson,* 27 Vet.App. 45, 59 (2014); *Eddy v. Brown,* 9 Vet.App. 52, 57 (1996).

[51] *See Gilbert v. Derwinski*, 1 Vet.App. 49, 57 (1990).

[52] *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995); *Gilbert*, 1 Vet.App. at 57.

[53] R. at 157 (Aug. 1975 Autopsy Report), 1427 (Death Certificate).

[54] R. at 155.

arguments are based on evidence and law that did not exist at the time of the 1976 RO decision. Even if § 3.313's retroactive effective date would permit an award of presumptive service connection for NHL back to 1976 for DIC purposes, the record before the RO in February 1976 did not contain evidence of a diagnosis of NHL, because Admiral Bonner was not diagnosed with the condition until 1995. And even if we somehow were free to ignore that point, evidence about Admiral Bonner's cause of death that was before the RO is not undebatable. It is well established that this type of evidence cannot form the basis of CUE.[55]

Even if the 1995 NIH report could be considered in assessing whether CUE existed in the 1976 RO decision, and we don't think it can, we would not conclude that the 1995 NIH report undebatably showed that Admiral Bonner died because of NHL. As the Board noted, the 1995 NIH report explains why it was more likely that Admiral Bonner died of NHL instead of Hodgkin's disease, but the report also contained phrases such as "favor the diagnosis of [NHL]" and "simulating Hodgkin's disease."[56] Because that evidence reflects that Admiral Bonner could have had either Hodgkin's or NHL or perhaps even both, it is not absolutely clear that if VA had considered the 1995 NIH report it would have manifestly changed the outcome of the February 1976 RO decision.

Additionally, though the Federal Circuit in 2007 and this Court in 2005 did not address the CUE issue before us today, we cannot ignore those decisions. We must recognize that a panel of this Court, as affirmed by the Federal Circuit, determined that it was plausible that Admiral Bonner's cause of death as it was known at the time of the February 1976 RO decision was Hodgkin's disease. Similarly, these earlier decisions confirm that Mrs. Bonner's 1975 claim for DIC for "cancer" did not include a claim for other types of cancer, including NHL.[57] And finally, the Federal Circuit also concluded that the 1995 NIH report was ambiguous.[58] Those decisions make it difficult—effectively impossible—to find CUE in the February 1976 decision today on the basis argued by the appellant. In other words, if the appellant's arguments concerning the cause of Admiral Bonner's death and the scope of Mrs. Bonner's claim failed on direct appeal, they must certainly fail under the significantly more stringent requirements to show CUE.

---

[55] *See Damrel*, 6 Vet.App. at 245; *Shockley v. West*, 11 Vet.App. 208, 213 (1998).

[56] R. at 155.

[57] *See Bonner II*, 497 F.3d at 1324; *Bonner I*, 19 Vet.App. at 194.

[58] *See Bonner II*, 497 F.3d at 1324 n.1.

In sum, the Court concludes that the Board's determination that there was no CUE in the February 1976 RO decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The Board also provided an explanation sufficiently detailed to enable the appellant to understand the basis of the Board decision and facilitate judicial review.

We end by noting that nothing in our decision should be taken as approval of how VA handled Mrs. Bonner's claim over the past 45 years. Portions of the claim's history are largely inexplicable, such as the years the Agency waited to rule on the appellant's request to be substituted in Mrs. Bonner's claim before the Agency. Moreover, if we were writing on a blank slate, we might very well have reached the same conclusion as Judge Newman did in her dissent in Mrs. Bonner's earlier appeal.[59] But we are not free to adopt a dissent, no matter how persuasive. We are left with no choice but to, reluctantly, affirm.

## IV. CONCLUSION

After consideration of the parties' briefs, oral argument, the governing law, and the record, the Court AFFIRMS the November 2, 2018, Board decision.

GREENBERG, *Judge*, Dissenting:

I.

With the utmost respect for my esteemed colleagues, I have no alternative but to dissent. This is a case of statutory construction and constitutional dimension. The statutes concerning clear and unmistakable error (CUE) are clear and unambiguous, *Conroy v. Aniskoff*, 507 U.S. 511, 514, 113 S.Ct. 1562, 1564, 123 L.Ed.2d 299. (1993). The CUE statutes both plainly read that either a decision by the Secretary or Board "is subject to revision on the grounds of clear and unmistakable error. If evidence establishes the error, the prior decision shall be reversed or revised."[60] But it has been wrongly applied with a misplaced focus on protecting incorrect decisions rather than ensuring the just and correct result for the veteran. The facts of this case would justify our finding of CUE in the February 1976 rating decision and reversal of the November 2018 Board decision. Congress created our Court in 1988 with the ability to remedy any incorrect decisions below, and enacted

---

[59] *Id*. at 1329-31 (Newman, J., dissenting).

[60] 38 U.S.C. §§ 5109A(a), 7111(a).

the CUE statutes to provide a remedy for cases wrongly decided *before* the availability of judicial review.

The medical aspects of this case should have been considered by applying the philosophy of Sir William Osler, the father of modern medicine, notably at Johns Hopkins, who famously stated *each case has its lesson – a lesson that may be, but is not always, learnt, for clinical wisdom is not the equivalent of experience. A man who has seen 500 cases of [lymphoma] may not have the understanding of the disease which comes with an intelligent study of a score of cases, so different are knowledge and wisdom.*[61] At the same time, the legal analysis should have proceeded with attention to the often paraphrased axiom of a veteran, wounded three times in the Civil War: *Great cases, like hard cases, make bad law. See Northern Securities Co. v. United States*, 193 U.S. 197, 364 24 S.Ct. 436, 468, 48 L.Ed 679 (Oliver Wendell Holmes, Jr., J. dissenting). I prefer *the truth that hard cases make good law. It was largely the crystallization of the rules of common law that caused constant appeals . . . and developed the system of law that we know as equity. Even the common law judges themselves had a conscience. See Arthur L. Corbin*, HARD CASES MAKE GOOD LAW, 33 Yale Law Journal 78 (1923).

From the earliest days of the Republic, Congress has one way or another focused on invalid pensioners or veterans. *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n., 1 L. Ed. 436 (1792).[62] Justice Ruth Bader Ginsburg expressed the view of the majority of the Supreme Court that this Court has the power to properly construe remedial statutes in a veteran-friendly light.[63] We should have applied this philosophy in deciding whether to reject and reverse the holding in this case.

Although I believe that this decision could and should be overturned as a matter of law, we have also missed another opportunity to act in a manner *similar to that of an Article III court when*

---

[61] *See* A. Scott, C. Ross, A. Gabali, R. Wilcox, *A Survey of the Therapeutic Landscape in Peripheral T-Cell Lymphomas: The Importance Of Expert Hematopathology Review in the Era of Targeted Therapies and Precision Medicine* ANNALS OF LYMPHOMA VOL. III. (Nov. 2019).

[62] Justice Ruth Bader Ginsburg, during her time as Professor at Rutgers Law School from 1962 to 1973, used *Hayburn's Case* as important evidence of the role of the federal judiciary. So did Justice Anthony Scalia at the United States Court of Appeals for Veterans Claims April 2013 Judicial Conference. He made specific reference to the importance of *Hayburn's Case* in the jurisprudence of the Court. *Supreme Court Press Release for Ruth Bader Ginburg's Death*, https://www.supremecourt.gov/publicinfo/press/pressreleases/pr_09-18-20; *see also Justice Scalia Headlines the Twelfth CAVC Judicial Conference*, http://www.cavcbar.net/Summer%202013%20VLJ%20Web.pdf (referencing *Hayburn's Case* and noting that "veterans are favored by a unique canon of interpretation.") (last visited Sep. 23, 2020).

[63] *See Scarborough v. Principi*, 541 U.S. 401, 411-19, 124 S. Ct. 1856, 1864-69, 158 L.Ed.2d. 674 (2004).

*reviewing an administrative agency*[64] and exercise our equitable powers to ensure the veteran friendly system created by Congress[65] is justly administered. Well established judicial philosophy notes that courts are always open to fashion a remedy. Going further, if the creators of a legislative scheme gave a class of peoples any rights, administrators of that law should uphold that right, and not limit its effectiveness. *See Driscoll v. Burlington Bridge Co.*, 8 N.J. 433, 86 A.2d 201 (1952) (Vanderbilt, C.J.); *see also Johnson v. Christ Hospital*, 45 N.J. 108, 113, 211 A.2d 376, 379 (1965) (per curiam) *affirmed for reasons stated below*, *Johnson v. Christ Hospital*, 84 N.J. Super. 541, 202 A.2d 874 (1964) (Matthews, Ch. Div.); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 366 (1886) (Matthews, J.).

## II.

I agree with the frequently expressed sentiments of the late Justices Ruth Bader Ginsburg and William J. Brennan Jr. in the matter of dissents:

> Dissents speak to a future age. It's not simply to say, "[m]y colleagues are wrong and I would do it this way." But the greatest dissents do become court opinions and gradually over time their views become the dominant view. So that's the dissenter's hope: that they are writing not for today, but for tomorrow.[66]

> Dissent for its own sake has no value . . . . However, where significant and deeply held disagreement exists, members of the Court have a responsibility to articulate it. . . . Unanimity is not in and of itself a judicial virtue. . . . Judges have no power to *declare* law. Courts *derive* legal principles and have a duty to explain *why* and *how* a given rule has come to be. . . . [Judges] are forced by a dissent to reconsider the fundamental questions and rethink the result . . . . In my judgment . . . the unique interpretive role of [our Court] with respect to the Constitution [and our authority] demands some flexibility with respect to the call of stare decisis. . . . [We should not be] captive to the anachronistic view of long-gone generations. . . . The right to

---

[64] *See also Henderson v. Shinseki*, 131 S.Ct. 1197,1205, n.2; 562 U.S. 428, 432 n.2, 179 L.Ed.2d 159 n.2 (2011) (declaring that congressional solicitude for veterans is plainly reflected in "the singular characteristics of the review scheme that Congress created for the adjudication of veterans' benefits claims," and emphasizing that the provision "was enacted as part of the VJRA [because] that legislation was decidedly favorable to the veteran")

[65] Veterans Judicial Review Act (VJRA), 102 Stat. 4105 (codified, as amended, in various sections of 38 U.S.C. (2006 ed. and Supp. III)) §§ 7251, 7252 (a)(2006 ed.).

[66] *Ruth Bader Ginsburg Interview*, https://www.npr.org/templates/story/story.php?storyId=1142685 (timestamp 3:50-4:05).

dissent is one of the great and cherished freedoms by reasons of the excellent accident of our American births.[67]

## III.

Admiral Emmet P. Bonner served on active duty in the U.S. Navy from June 1939 to April 1972, including service in World War II, Korea, and Vietnam.[68] The veteran was awarded many decorations for his meritorious service including the Legion of Merit, Joint Service Commendation Medal, World War II Victory Medal, Korean Service Medal, National Defense Medal with one star, and the Vietnam Service Medal.[69] I would have analyzed a service record of four decades and three wars, together with the frequent exposure to cancer-causing chemicals as worthy of judicial review analogous to that of the implied covenant of good faith and fair dealing in all contracts. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917) (Cardozo, J.) Surely, Admiral Bonner had a right to expect a government that put him in harms way, thereby causing the harm, would acknowledge responsibility and adequate compensation.

## IV.

The pertinent facts of this case were more than adequately set out by Judge Newman in her 2007 dissent.[70] While stationed in the South Pacific, the veteran was exposed to radiation as an on-site participant in nuclear testing, and exposed to Agent Orange and other herbicides in the Republic of Vietnam.[71] The veteran died in August 1975, from cancer, which was misdiagnosed as Hodgkin's disease.[72]

---

[67] William J. Brennan Jr., *In Defense of Dissents*, 37 Hastings L.J. 427, 427-35 (1985) (emphasis in original). Justice William J. Brennan Jr. practiced law in New Jersey, served in the United States Army during World War II, served on the Superior Court of New Jersey from 1949 to 1951, and served on the Supreme Court of New Jersey until 1956 when he was nominated as a recess appointment by President Eisenhower. Justice Brennan also expressed his strongly held view of veterans as a unique class of litigants, while adhering to customary notions of constitutional and statutory construction. *See Johnson v. Robison*, 415 U.S. 361, 94 S.Ct 1160, 39 L.Ed.2d 389 (1974). Long before our Court was created by Congress in 1988, Justice Brennan recognized that there was no bar to consideration of a veterans constitutional claims. *Johnson v. Robison*, *supra* at 367.

[68] R. at 230. (DD Form 214).

[69] *Id.*

[70] *See Bonner v. Nicholson*, 497 F.3d 1323. 1329-31. (Fed. Cir. 2007).

[71] *Id.* at 1329.

[72] Compare R. at 1427, *with* 155; *see also Bonner*, 497 F.3d at 1330, (J. Newman, dissenting) (citing the 1995 NIH report noting the veteran's diagnosis favored non-Hodgkin's lymphoma (NHL) and the September 2001 Board decision that sets forth the finding of fact that the veteran's diagnosis of Hodgkin's lymphoma was in error and that the veteran

## V.

In September 1975, the veteran's widow applied for Dependency and Indemnity Compensation (DIC) benefits claiming that the veteran died from *cancer* that stemmed from his military service.[73] In February 1976, the regional office (RO) denied the widow's DIC claim, mistakenly finding the veteran died from Hodgkin's disease, which was not caused by service.[74]

## VI.

In June 1995, the National Institutes of Health (NIH) reviewed the August 1975 autopsy report and a group of cell tissue slides preserved from the veteran's autopsy, evidence that existed at the time of the February 1976 denial, and concluded that the veteran's diagnosis "favored" NHL.[75] In November 1995, the widow received the June 1995 NIH report, and applied for retroactive benefits,[76] but because VA "refused to correct the error in [the veteran's records],"[77] the RO awarded DIC benefits effective November 1994, but no earlier.[78]

## VII.

A long and arduous appeals process began, which culminated in an August 2007 Federal Circuit decision,[79] where the Federal Circuit noted that "[t]he only way the RO's unappealed 1976 decision can be collaterally attacked is through a claim of 'clear and unmistakable error (CUE).'"[80] In June 2008, the widow submitted a motion alleging CUE in the February 1976 rating decision,[81] which was denied in July 2009.[82] On October 6, 2010, VA was notified about the widow's

---

actually died of NHL.)

[73] R. at 20.

[74] R. at 1644, R. at 1427, 1680.

[75] R. at 151-56.

[76] R. at 1523-24.

[77] *See Bonner*, 497 F.3d at 1330.

[78] R. at 1507.

[79] *See Bonner v. Nicholson*, 19 Vet.App. 188 *aff'd by Bonner*, 497 F.3d at 1323.

[80] *Bonner*, 497 F.3d at 1327, n. 3.

[81] R. at 859-70.

[82] R. at 682-87.

unfortunate death,[83] which prompted quick action by VA a mere 6 days later on October 12, 2010, denying the widow's claim that the February 1976 rating decision denying DIC benefits contained CUE.[84]

## VIII.

The matter continued through its procedural and bureaucratic labyrinth for several years[85] before it came before the Board again in November 2018.[86] The Board ultimately concluded that there was no CUE in the February 1976 rating decision, and thus "no new benefits are being awarded by the Board, and the Board need not address the appellant's benefit distribution arguments at this time."[87] This appeal ensued.

## IX.

The appellant's position was that if the September 1975 claim is still open, and if the 1995 NIH report diagnosed an NHL diagnosis, then the Board erred in denying the 1975 claim if that claim raised NHL.[88] The appellant alternatively argues that equitable estoppel or other equitable remedies should be available based on the VA's inadequate notice of denial of benefits, delay, and other "deceitful or fraudulent actions" that caused harm.[89] The appellant further requests the Court to set aside the Board's denial of benefits as contrary to the widow's Constitutional right of due process.[90]

---

[83] R. at 657.

[84] R. at 636-48.

[85] *See* R. at 542-45; *see also* R. at 29.

[86] R. at 3-12.

[87] R. at 4. Although the Board did not reach this question and thus it is not before the Court, my views on benefits being properly disbursed to deserving recipients remains unchanged. *See Staab v. McDonald*, 28 Vet.App. 50 (2016) (J. Greenberg, majority).

[88] *Bonner v. Wilkie*, 18-6927 October 23, 2020, Oral Argument, https://www.youtube.com/watch?v=U-gZ88tipkg (Appellant's argument starting at 42:46 to 43:18) (last visited Dec. 23, 2020).

[89] *Bonner v. Wilkie*, 18-6927 October 23, 2020, Oral Argument, https://www.youtube.com/watch?v=U-gZ88tipkg (Appellant's argument starting at 36:01) (last visited Dec. 23, 2020).

[90] *Bonner v. Wilkie*, 18-6927 October 23, 2020, Oral Argument, https://www.youtube.com/watch?v=U-gZ88tipkg (Appellant's argument starting at 3:43 to 28:37) (last visited Dec. 23, 2020).

## X.

Regarding the September 1975 claim still being open, the appellant argued there was CUE in the February 1976 rating decision because VA failed to properly apply 38 C.F.R. § 3.312[91] when it narrowed the claim for cause of death to only Hodgkin's lymphoma and denied the widow's DIC claim.[92] The evidence was clear that the veteran served in the Republic of Vietnam, was on site during H-bomb tests, and was exposed to other carcinogens such high energy radar from missiles on warships, and that if such evidence was properly considered, as the regulation requires, it would be undisputed that the veteran's cause of death, claimed by the widow as cancer, was related to service. The appellant also argued that the fact that the 1995 NIH report and autopsy was done using evidence from the 1975 autopsy,[93] and definitively shows that the veteran actually died from NHL indicates that the 1976 diagnosis and denial based on Hodgkin's lymphoma further contains CUE. Alternatively, the appellant argued that if CUE does not apply, the 1975 claim is still open because the February 1976 "checkbox notice" denial was inadequate notice of denial, and did not give the widow the proper appellant rights.[94]

Responding to concerns that his arguments were precluded by collateral estoppel, the appellant noted that collateral estoppel is an equitable doctrine and litigants who invoke it must have clean hands, and that courts should not apply it in favor of parties that have acted fraudulently or by deceit.[95] The appellant noted that the widow first filed her CUE motion in June 2008, and requested expeditious treatment.[96] Yet VA took 3,802 days, over 10 years after the initial motion was filed, to issue a Board decision in November 2018. Further, throughout the time on appeal, VA has advanced an argument that the 1995 diagnosis was unclear, by characterizing it by saying that the evidence "favors *a* diagnosis" of NHL, rather than "favors *the* diagnosis"[97] of NHL which

---

[91] 38 C.F.R. § 3.312 requires adjudicators to "exercise of sound judgment, without recourse to speculation, after a careful analysis has been made of all the facts and circumstances surrounding the death of the veteran, including, particularly, autopsy reports" in determining cause of death claims.

[92] Appellant's Brief at 14.

[93] R. at 154

[94] *See Ruel v. Wilkie*, 918 F.3d 939, 942 (Fed. Cir. 2019) (holding that to meet the notice requirements of VA regulations, an explicit denial must state, or clearly identify in some other manner, the claim(s) being denied)

[95] *Bonner v. Wilkie*, 18-6927 October 23, 2020, Oral Argument, https://www.youtube.com/watch?v=U-gZ88tipkg (Appellant's argument starting at 13:45) (last visited Dec. 23, 2020).

[96] Appellant's Brief at 26.

[97] R. at 151-52.

casts doubt upon the certainty of the 1995 diagnosis. The appellant argues these examples of unclean hands would support the Court's decision to apply equitable estoppel principles in this veteran-friendly area of the law, and thus should keep the case open.

The appellant also asserted his arguments were not foreclosed by the 2005 CAVC or 2007 Federal Circuit case because the Federal Circuit found that issue veteran's cause of death was not actually decided by CAVC because CAVC found that "it could not conclude that the veteran died from NHL" and ultimately "did not need to reach the issue of cause of death." Further, the appellant argues that because the Board never raised issue preclusion themselves, thus any arguments now are merely a post hoc argument.

## XI.

I agree that the Court could rule in favor of the appellant as a matter of Constitutional dimension regarding due process, statutory construction of the CUE statute, and the 1976 RO's misapplication of the veteran-friendly regulation. As Judge Newman correctly stated, the facts plainly show that the veteran actually died of NHL, the 1975 autopsy report was incorrect, and that the Board should have corrected the autopsy, particularly considering the new diagnosis was made examining evidence that existed at the time of the February 1976 rating decision. Unfortunately, the majority classifies the 1995 NIH report as "new evidence," fails to plainly state that the veteran died from NHL and was clearly misdiagnosed in 1975, and concludes that collateral estoppel, or issue preclusion, prevent us from considering these arguments on the merits.[98] Surely, VA would not argue that the veteran's condition had changed between his death in 1975 and the 1995 corrected diagnosis. Yet, based the heightened standard shielding decisions from full judicial review on a basis known as CUE, the widow was never awarded her Constitutionally entitled DIC benefits.[99] The widow's claim was eventually denied by this Court in 2005 and affirmed by the Federal Circuit in September 2007, which the majority believes even further narrows our jurisdiction here.[100]

---

[98] *see supra* section III.B, p.8.

[99] R. at 576-85.

[100] *See supra* Section II.A.

20

## XII.

However, this downstream earlier adjudication of CUE that ties our hands today and protects a wrongly decided February 1976 decision violates Congressional intent of creating a special class of litigants which this Court was designed to protect.[101] After all, the CUE statutes both plainly read that either a decision by the Secretary or Board "is subject to revision on the grounds of clear and unmistakable error. If evidence establishes the error, the prior decision shall be reversed or revised."[102]

## XIII.

I am not unmindful of the substantial history of judicial review surrounding these statutes. [103] Nevertheless, with great respect, I firmly believe courts have misconstrued Congressional intent and the plain language of the statutes.[104] CUE has been wrongly interpreted to focus on the finality of a decision based on arbitrary deadlines, when it should be whether the final decision is correct. For too long, the Court has afforded misplaced protections to incorrectly decided rating and Board decisions often to the detriment of the veteran. Congress plainly drafted 38 U.S.C. §§ 5109A and 7111 as remedial statutes for veterans to seek redress of wrongly decided decisions, particularly before judicial remedies were made available to them via creation of this Court. Although the standard set for obtaining revision of a decision based on CUE is high, it would be absurd to assume that undisputed errors by VA should be insulated from collateral attack merely because they happened to be the "right" kind of error.

## XIV.

The veteran's canon, reflecting Congressional intent to presume interpretive doubt in the veteran's favor, has always been consistent, and remains paramount. *See Shinseki v. Sanders*, 556 U.S. 396, 416, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009) (Souter, J., *dissenting*) (stating that

---

[101] *See Henderson*, 131 S.Ct. at 1202, n.2; 562 U.S. at 440, 179 L.Ed.2d at 159 (2011) (declaring that congressional solicitude for veterans is plainly reflected in "the singular characteristics of the review scheme that Congress created for the adjudication of veterans' benefits claims," and emphasizing that the provision "was enacted as part of the VJRA [because] that legislation was decidedly favorable to the veteran")

[102] 38 U.S.C. §§ 5109A(a), 7111(a).

[103] *See supra* Section III.C

[104] *Conroy*, 507 U.S. at 514.

Congressional "solicitude [for veterans] is plainly reflected in the [Veterans Judicial Review Act of 1988], 38 U.S.C. §7251 et seq.], as well as in subsequent laws that 'place a thumb on the scale in the veteran's favor in the course of administrative and judicial review of VA decisions'") (quoting *Henderson v. Shinseki*, 131 S.Ct. 1197,1205 (2011)). As Justice Alito has recognized, "we have long applied 'the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." *Id.* at 1206 (quoting *King v. St. Vincent's Hospital*, 502 U.S. 215, 220-21 N. 9, 112 S.Ct. 570, 116 L. Ed. 2d 578 (1991)). *See United States v. Oregon*, 366 U.S. 643, 647, 81 S. Ct. 1278,6 L.Ed. 2d 575 (1961) ("The solicitude of Congress for veterans is of long standing.")

## XV.

Therefore, even if the CUE statute has been correctly interpreted and applied, this Court can still correct this obvious wrong. One thing that distinguishes this Court from the Board is the ability to fashion a just result consistent with Congressional intent, which the I believe we have once again missed an opportunity to do. *See Bly v. McDonald*, 28 Vet.App. 256, 265-66 (J. Greenberg, dissenting) *vacated and remanded by Bly v. Shulkin*, 883 F.3d 1374 (Fed. Cir. 2018); *see also Ollis v. McDonald*, 27 Vet.App. 405, 414-15 (J. Greenberg, dissenting) *aff'd in part, vacated in part, and remanded by Ollis v. Shulkin*, 857 F.3d 1338 (Fed. Cir. 2017); *see also James v. Shulkin*, 29 Vet.App. 127, 130-31 (J. Greenberg, dissenting) *vacated and remanded by James v. Wilkie*, 917 F.3d 1368 (Fed. Cir. 2019)(citing *Henderson* when noting the need for flexibility in applying rules in the uniquely pro-claimant arena of veterans benefits law); *see also Taylor v. Wilkie*, 31 Vet.App. 147, 155-62 (J. Greenberg, dissenting).

While the Court acknowledges "the justice of [veterans'] claims and the meritorious character of the claimants," *United States v. Yale Todd* (1794) (unreported decision discussed in the margin of the opinion in *United States v. Ferreira*, 54 U.S. 40 (1852) (Taney, C.J.)), it once again fails to consider equitable maxims in deciding this case.

## XVI.

Thus, while I agree with my colleagues that finality is an important principle that should not be hastily and thoughtlessly abridged, I cannot join in considering it an immutable ratification for undisputed errors. For far too long this Court has limited its own powers in equity, shying away

from fulfilling express Congressional intent of benefiting this nation's veterans. If there was ever a case for the Court to set precedent of exercising its equitable powers bestowed upon it by Congress, it is this one. The veteran served the United States honorably for over four decades and multiple conflicts and wars, and left behind his wife and children after dying from cancer due to herbicide and radiation exposure. For this Court to ignore the "obligatory veteran-friendly positions of the law" and deny a veteran, or his or her family, deserved benefits based on a "hyper-technical reason whereby [our Court] refused to consider the merits of [the appellant's] claim"[105] of CUE is a travesty that plainly conflicts with Congressional intent in creating a veteran-friendly system. This unfortunate result is only compounded in light of VA's "largely inexplicable"[106] delays over the 45 years the veteran's family has sought benefits, and, at best, nonfeasance in adjudicating the widow's claim. Any argument that the appellant is not entitled to equitable relief from VA ignores congressional intent and the reason this Court was created. [107]

This case is illustrative of systemic legal errors that can be corrected by our Court. *See Mathis v. Shulkin*, 137 S. Ct. 1994 (Sotomayor, J., dissenting) (noting the continuing "dialogue over whether the current system for adjudicating veterans disability claims can be squared with VA's statutory obligations to assist veterans in the development of their disability claims."); (Gorsuch, J., dissenting) ("Congress imposed on the VA an affirmative duty to assist—not impair—veterans seeking evidence for their disability claims."). The conduct of VA here is certainly emblematic of a systemic, bureaucratic disorder, which we are uniquely ordained to deal with. We should have done so here.

## XVII.

"[F]iat justicia, ruat caelum, let justice be done whatever be the consequence." *Somerset v. Stewart*, (1772) 98 Eng. Rep. 499 (K.B.) 509 (Lord Mansfield). "The courts can exercise only the judicial power, can apply only law, and must abide by the Constitution, or they cease to be civil courts and become instruments of military policy." *See Korematsu v. United States*, 323 U.S. 214, 247, 65 S.Ct 193, 208, 89 L.Ed 194, 247 (Jackson, J. dissenting). For these reasons, I dissent.

---

[105] *Bonner*, 497 F.3d at 1331 (J. Newman, dissenting).

[106] *See supra*, section III.C, p. 13.

[107] VJRA, 102 Stat. 4105 (codified, as amended, in various sections of 38 U.S.C. (2006 ed. and Supp. III)) §§ 7251, 7252 (a)(2006 ed.).